We'll turn to a state of Andre J. McKelvey versus Commissioner of Internal Revenue. The last case on our calendar. May it please the court, my name is Clint Carpenter, and I represent the Commissioner of Internal Revenue in this appeal. I'd like to reserve two minutes for rebuttal. Through the transactions at issue in this case, Mr. McKelvey, the decedent, received $194 million in cash during his lifetime on which he paid no income tax. He did that by taking these contracts that he had entered into with the banks called variable prepaid forward contracts, or VPFCs. He accomplished the tax result by extending the term of those VPFCs by 17 months to a date that ended up being after his death. But the tax law doesn't allow a taxpayer to postpone the day of reckoning by fundamentally or materially changing the terms of the contract, and so that's the central issue in this case. Was that 17 month change of the term of the contracts a fundamental or material change? When you say it's the central issue, I understand your point that it's central to whether there's short term gain. Is it central to whether there's a constructive sale, or is that a different issue? The constructive sale is a different issue. We have not taken the position that absent a fundamental or material change that there could be a constructive sale, the statute doesn't necessarily foreclose it, but we've treated it as sort of a first step, because with the fundamental or material change, you treat the modified contract as a new contract. And so then with constructive sale, you're looking at, well, what are the terms of the new contract? All right, so for the constructive sale, you're saying the material change is a necessary but not a sufficient condition? That's how we've treated it, yes. And you couldn't, I take it, possibly determine the amount of gain from a constructive sale without something beyond the material change ruling, is that right? You have to know values. Yes, I believe you could actually determine the amount of gain, but on the constructive sale issue, what would remain for the court to determine if the court found there was a fundamental change? The issue then would be whether the amount of property to be delivered under the new modified contracts was, at that time, substantially fixed. And we've argued that it was, in reality, it was substantially fixed, because there was only a very remote chance that the amount of property to be delivered would be anything issue. Yes. Material change. Yes, and that's the constructive sale issue. Right now you're on the material change, is that it? That is it, Your Honor. Material change, in your view, because the valuation dates were changed. That's right. The valuation dates were changed, and so, as we've said in our brief, the sort of the bet between the banks on one side and Mr. Kelvin on the other side, that they were each making a bet on what would happen to the price of monster stock during the term of the contracts. And by changing that by a year and a half, when you're talking about a type of property, like publicly traded stock, that has a substantial price volatility built in, a 17 month change is a huge change. And as an example, you can look at the treatment of call options, which the parties agree that these VPFCs can be fairly analogized to call options. And if you look at, for example, call options that were traded on the days that Mr. McKelvey entered into the original contracts, the longer the maturity date on a call option, the greater the premium one would have to pay to acquire that option. The maturity date of a call option goes to the very essence of an option. And the same is true with these VPFCs. If there's enough of them, first of all, you say material or fundamental, which I take as a phrase you get from one place, and then you say material, which is a phrase, a word alone, you take from another place. Is that right? Fundamental or material change is the language that's used in the revenue ruling. And I think we've approached those as sort of being interchangeable. They're synonymous. We've treated them as such in our briefing. Okay. So- If the postponement or extension of the valuation date was a material change, you still have to determine the amount of gain, right? Yes, yes. How do you do that? Well, and that becomes fairly complicated. And so on the amount of gain, we've actually asked the court just to remand that to the tax court. It could potentially involve factual findings. It was a disputed issue in the tax court, which the tax court didn't reach based on the way it was solved. The expert did offer a view, right? That using the Black-Scholes, is that the form? Black-Scholes, I believe, yes. Black-Scholes evaluation method, that the liability under the Morgan Stanley VPFC was reduced by 2.28 million, I think, and that the other, the Bank of America one was reduced by about 1.8, so it's around 4 million of short term capital gains. Is that your estimate based on his testimony? No, the- Is that wrong? That, partly. What the expert was determining was the value of Mr. McKelvey's obligations at the particular point in time. And so, you're correct, the change in value based on the extensions, according to the expert, was about $4 million. Is his liability- That's not the gain you're proposing to tax, though. No, that's correct. The gain would be the difference in Sorry, I'm trying to think of how to explain it simply. The- Value of the second contract minus a zero basis, wouldn't it? Well, that's essentially right. And so, there could be- $4 million or $11 million that he paid goes into the basis of the second contract. That's right, yes. So, I mean, we're talking about what he- We're talking about the expert's ability not to come up with the $4 million figure. That's almost trivial here in this case. We're talking about his ability to give you the $88 million or maybe $83 million, depending upon which version you like. That's the gain you're after. That's right. That's right. And so, it's- In figuring that gain, does the probability analysis enter into it? No, Your Honor. It doesn't? Well, part of that gain was the constructive sale issue, and that's where the probability analysis comes into play. No, I'm not talking now about constructive sale. I'm staying with your first issue. Yes. The gain from acquiring the second contract. Yes. The gain from acquiring the second contract does not involve the probability analysis. At all? At all. At all. Then how do you determine the value of the second contract? Well, the value of the second contract was determined by the expert. I know that. How did he do it? Just tell me, how did he do it? Oh, he did it by, essentially, he said that a VPFC can be treated as, it can be valued by valuing, essentially, sort of its components. And a VPFC is sort of the sum of a put option, a call option, and a discount loan. He broke it into three. And so, he broke it into the three parts, and he valued it that way. And how did he value the three parts? Through using, on the options, it was the Black-Scholes formula. Does the Black-Scholes formula use a probability analysis? The Black-Scholes formula gives you a probability, but my understanding is in coming up with those dollar amounts. I don't believe that factors into it. Wait a minute, I don't get that answer. First, you said it uses a probability analysis, and then you just now said, but it doesn't factor in. Those seem to be inconsistent. The Black-Scholes formula gives you a value, and then it also gives you a probability that the option will actually, that the strike price will be met with the option. Now, is that the same probability analysis that is used for the value of the gain on the constructive sale? That is the probability analysis that we are relying on. Name one. Did you say that there was a constructive sale? All right. So, we now know that probability analysis goes into both calculations, right? Calculation of short-term gain on the extension and long-term gain on the constructive sale, right? I'm not sure how the probability figures into the valuation of the option. My understanding is that— Regardless of how, is it the same in the two transactions? It is. All right. And is it in the record so that we can look at it? It is. It is. Where is that? Yes. Well, it's in the expert's report, which is the page range— The report is there. Does his report ever tell us how the probability analysis works? I don't recall specifically. All right. I'll ask it a different way. Is there any other area of tax law where the value of anything is determined on a probability basis? Well, I believe so. I think that the value of an option, for example, is most commonly determined, according to the expert, by using this Black-Scholes formula. And that's how options are typically, I guess, valued. And the question is essentially, what's the fair market value? And so when you have a complicated financial instrument like this, it's not apparent what the fair market value is. And you have to turn to an expert in this instance. And so the expert made the determination about the value. I don't think there's any dispute. The other side didn't put up an opposing expert or disagree with the valuation. There's been disputed, and that's enough reason. So yes, I think that essentially, the value is what the expert determined. And as far as the expert's methodology, clearly I'm not fully versed into how the probability and so forth factored into that. But I don't think there's any dispute that it was an appropriate methodology. So far on the short-term gain, you're proceeding, I take it, on the assumption that what was exchanged was property. We are not proceeding on that assumption. No, we believe that it was property. But what our argument is is that when you have a fundamental or material change, that establishes that there's a deemed termination of the original contract, and the modified contract is treated as a new contract. So as a result of that, there's going to be a termination of obligations. So you've got two approaches. One is that it's property was exchanged. Two is, if it's not property, there was a cancellation of an obligation. Correct. You've got to have one or the other, right? Correct. Is the calculation of gain the same for either theory? No, not necessarily, and not in our view. So I guess, again, this is something we would suggest that should be remanded to the tax court to deal with in the first instance, because I assume my friend on the other side is going to disagree. But in our view, one of the main differences would be that under Section 1001, under the regulations, that if it's a property, then the amount realized is based on the amount of cash that he received, plus the value of the property that was received. So it's going to be based on the value of the new modified contract, whereas the value, if you're talking about a termination of obligations, you're going to be looking at what were the obligations that were terminated, and those would be the obligations under the original contract. And as the expert showed, there's a difference in those valuations of about $4 million. So the gain is going to be very similar under either approach, but in our view, it would come out different. And that's one of the reasons why we think it's best to do remand that issue to be litigated before the tax court. Thanks, Mr. Coleman. Thank you. I'm going to give you some extra time, but you deserve some. Thank you. Good afternoon. May it please the court. My name is Mark Lanford. I represent the estate of Andrew McKelvey. Your Honor, the tax court got this case exactly right. When Mr. McKelvey extended the maturity dates of his two variable prepaid forward contracts, he did not realize gain, did not exchange property for other property, nor was he relieved of any liability. His liability under these two contracts was measured in terms of an uncertain number of shares of stock. When he extended the VPFCs, he kept that liability open. It was still undetermined. Same liability? Same liability, Your Honor. In fact, Wasn't it to turn over stock to be valued at a different date? It was to turn over an uncertain number of shares of stock. To be valued at a different date. To be calculated at a different date. Yes, Your Honor. If a call option is extended. It's similar to a written call option. When those dates are extended, there's a taxable event, isn't there? There is not, Your Honor. No? And also, I do want to highlight that this is different from a written call option. Let's stay with your answer. You're saying if a call option date is extended, there's no taxable event? For the writer of that call option, we are aware of no support in the law or in any case that we have seen where the writer of a call option, if all that happens is the call option is extended, that that would be deemed a taxable event. That is not the law. The laws that Virginia Iron and Coal is on point on this. Hicks is on point on this. Each of these cases stand for the proposition that when you keep open the same obligation from an option writer's perspective, you have not yet terminated that first option. And you have to keep the premium you received in suspense. To sell a call option, is there a gain? If you sell a call option, so you're a holder of a call option, and you sell it, generally, yes, there would be. There would be a gain or loss. Because- Even though it's uncertain whether the option will be exercised. Well, at that point, once you have sold it, you are done with that transaction. But again, I think that's why- What you're selling is a piece of paper that is uncertain as to its exercise. That's correct. Right? Still taxable when you sell it. Because from the option holder's perspective, that is property. So if you dispose of that property, your right to exercise an option, and you dispose of it, if you sell it, you can realize gain or loss. But that's why we think it is critical for this court to analyze the case, not the way the government proposes, where one just considers, was there a material or fundamental change here? We have to think, what was the purported realization of that? And to analyze it properly, one needs to know, is this a property transaction? Did he exchange or dispose of property in exchange for other property? Or, the only other way he could realize gain here, is was he relieved from a liability? Again, property, if he's dealing with the exchange of property for other property, that's handled under section 1001. If it's a potential relief from a liability, it's under section 61. Those two statutes have different rules that apply for when one realizes gain. And in fact, that's what is so important here, is it's a realization question. It's not simply, did he reduce the expected cost of fulfilling his obligations? The question is, did he realize gain? Did he close and complete his transaction? And by extending the dates here, he did not. But isn't a reduction in liability a gain? Your Honor, he did not actually reduce his liability. According to the expert who testified persuasively, I thought, about how the Black-Scholes formula applies to options and so on. As Judge Newman has pointed out, the valuation date is a critical date in these transactions. And by changing it and putting it off into the future, another 12 or 14 months, that significantly reduced his liability, applying Black-Scholes formula to value the BPFCs at those two different times. So what's wrong with that? Your Honor, what's wrong with that is he didn't reduce his liability. He reduced his expected cost of fulfilling the obligation. But his liability is measured in terms of stock, and an uncertain number of shares of stock. And what's important here is if it changed, I don't understand when you're saying he didn't reduce. He changed his liability, didn't he? Absolutely, he changed his liability. He changed the date on which he would calculate and ultimately settle his liability. But he didn't reduce the quantum that he owed. Well, he thought he was getting something better, didn't he? Yes, that's part of- He paid $11 million to get it. He paid $11 million to put off having to deliver. And you're saying that someone who pays $11 million to get something else doesn't get anything materially different? Your Honor, he didn't have something to get. He did not have something or get something. He put off an obligation. So he did- this wasn't charity. He paid $11 million to two banks. Absolutely, and there was value to him in putting off his obligation. But again, that is different from actually lessening his obligation. And what's critical is if the stock price had gone up- I don't understand how you can say a man who pays $11 million has one contract, says, I want another contract, I want one with a different valuation date, and I'll pay you $11 million for it. And you say that's not a material change. Your Honor, whether it's a material change or not is not the relevant question for has he realized gain. Because again, at this point in time, he has only an obligation. He has an obligation to deliver an uncertain number of shares of stock. And when you say at this point in time, you mean at the moment he gets the extension, is that it? Is that the moment in time? And from every point after he's received the prepayments. And why do we determine whether he has property only at that time? Why don't we determine whether he has property at the beginning of the transaction? Because the realization question is, if the theory of the IRS is that he realized gain through the exchange of property or a deemed exchange of property. Question is, what did he give up and what did he gain? And a contract is just a bundle of rights and obligations. At this point, he didn't give up a right to receive a prepayment. House, he'd have property, wouldn't he? Yes. He had a house with a 100% mortgage. Has he still got property? Yes. But that's, again, what he has at this point, he has cash that he has received. And he holds on to that and he has an obligation. And he puts off that obligation. And if the stock price had gone up after his extension, his ultimate cost of satisfying that obligation would go up too. And so- You've got an expert saying that at the time he did it, the value was so far below the strike force that there was, what did he say, a 15% probability that it would even recover to the strike price. That's correct. What are we to make of that testimony? Word to make of it, that shows one expert predicted that there was a 15% chance of it rising above the strike price. I'm aware of- The expert that said, he's wrong, it's really 120%? No, but we, what we- And we take it as it's only a 15%, right? Because that's the only evidence in the record. Fair enough, Your Honor. But what we would say is, that's not the relevant consideration here. And the question is, is there a real possibility that this stock is going to result in him ultimately having a loss position on these VPFCs? And there absolutely is that possibility. In the first- Another way. Could he have said to the banks, I do want an extension of the valuation date, and the new date is one year after, one day after my death. Could he do that? So an uncertain valuation date? No. Or an uncertain settlement date? Objectively ascertainable, but uncertain. One day after my death. Yes, he could have. There's nothing in the record to suggest that, again- Could any taxpayer do that? If it were negotiated with his counterparties, I suppose one could. And thereby assure the stepped up basis for the estate tax. I think at that point, you would have a different problem in that it would become income in respect of a decedent. Because at that point, there would be nothing for the estate to actually do or choose. So I don't know that that would actually get the tax result that occurred here. He couldn't do that. I need to think about it, Your Honor, but I don't believe one could. He can extend it to within two months of his death. He can extend it, again, as long as he is not reducing his liability, which we absolutely think he did not do here. He kept his uncertain liability measured the exact same way through the extension. You're asking me to say measure the same way. You mean the formula for measuring is the same. Yes. But the data on which it's applied is different because the date's different. And it could end up being more costly or less costly. It's still uncertain. That's true, too. But as of the day he did it, there was only a 15% probability it would equal the strike price, right? That's true. Or that's a fair estimate based on one expert's probability. And there's no conflicting evidence of that? No. We think that is a fair probability to rely on here. We just don't think that that has ever been held to be relevant by the IRS and a court. Essentially what they're asking this court to do is draw economic lines in a very complicated area of tax policy when previously every regulation, every court, every revenue ruling has looked at the fundamental principles of what is going on, which is, do you still have — Oh, go ahead. Finish. I'm sorry. No. From our perspective, the question is, does he still have the same open transaction? And I know the court is questioning, should you view it as the same transaction when you measure it on a different date? I like your effort to invite us to look at the fundamental aspect of what's going on. And I suggest to you that the fundamental aspect of what's going on is somebody who has his whole asset value tied up in one stock who wants to change it to a diversified portfolio and goes to two banks and gets $194 million so he can do that, and you want us to say there's no gain at all when he does that? Your Honor, that's been blessed explicitly by the IRS. The revenue ruling 2003 — On the first contract, they've blessed it. Why they did that, I don't know, but that's their problem. They did it. But, Your Honor, again — Now we have a new transaction of a swap for a second contract with a new valuation date. We disagree that it is a new transaction. We think it is the same open — Well, it's a second transaction. Let's not call it new then. Let's call it second to the first one, right? Your Honor, the law supports, in our view, the conclusion that as long as you have an open transaction, if all you do is put off the settlement and calculation of the liability — because, again, any — the IRS analysis — In doing this, this is unprecedented. Anybody ever done this before and achieved the result you want? We think this is entirely analogous to short sale. I understand it's analogous, but has anyone ever done this maneuver of extending valuation dates on a variable price forward contract and not been charged with a taxable gain? We're not aware of any precedent one way or the other. So to say to them, oh, they're doing something wholly new is really no better an argument than to say you're trying to do something wholly new and we have to decide who's going to win on this unusual case. But again, respectfully, Your Honor, we think the precedent that we cite in our brief all points to the view that when you change a valuation date or calculation date — because really, in any forward contract, the date of settlement of a contract can be viewed as key to the ultimate valuation. So any extension of a forward contract, the IRS could be making these same arguments. They don't because the IRS has to date and courts to date have said when you have an open transaction and you have uncertainty and you keep that same uncertainty going, you don't stop and value things as of a given date. You wait until there is certainty. There is the same uncertainty, and they would say it's a different uncertainty because it has a different date. We think that argument proves too much. Because again, from Mr. McKelvey's standpoint, when he extends this — All he would prove is that you lose. Well, fair enough, Your Honor. We think it's a dangerous precedent to set because when Mr. McKelvey extended this, he didn't know whether that would ultimately reduce his cost of satisfying his obligation or increase it. Didn't he, both he and the bank, have to have some notion of what the change in settlement  They had — They attached a price to it. They have a model. Right? They do. And they have their respective estimates as to which people can differ. Mr. McKelvey, as the founder of this company, Monster Stock, it's reasonable for him to think, you know what, this stock has gone down from 32 to 17 in the first 10 months of this contract. I believe in this company. I think the stock is going to rise back up. I don't want to deliver my stock in two months. I want to keep my transaction open. I want to let it ride in hopes that the stock is going to rise back up, and I will be able to realize the appreciated value of that stock. He kept that possibility open. Volatility is recognized in the Black-Scholes formula, and I gather that the creators of the formula won the Nobel Prize for developing a way of pricing options that includes volatility and such things as settlement date that we're discussing. And you haven't offered a different kind of analysis for the valuation, yet people trade in these contracts. So we're left with, oh, it's open, you know, no one knows, and yet people are, in fact, valuing them and trading on them. But, Your Honor, it's not just a question of valuation that is uncertain. It's also the character of what's going to happen, because, again, if Mr. McKelvey ultimately settled his VPFCs by delivering stock, which is what happened here, then that needs to be treated as a sale of the stock delivered for whatever his basis in the stock was. If instead he ultimately cash settles the VPFCs, that's going to be treated differently. That's not going to be a sale of stock. But that's the subsidiary, I mean, that's the underlying transaction, but part of what we've been talking about, as I understand it, is with regard to the government's position on short-term capital gains, that the replacement of the new VPFC, replacing the original VPFC with the new, represented either an exchange of property or a reduction in his obligations, and that that is a short-term, the kind of transaction you're just describing is what ultimately happens with respect to long-term capital gains and how much is realized. Isn't that right? Two different— I would frame it a little bit differently, though, Your Honor, in that the transaction that ultimately underlies these VPFCs is still open the whole time. If you artificially say that the extension of the VPFCs was a new realization event, you cannot keep that same underlying transaction open because one would have realized gain in artificially midstream when he still hasn't yet decided whether he's going to deliver  Isn't that the nature of derivatives, though? Derivatives play off of other instruments. But that is not the nature of how derivatives have ever been taxed before. Again, we are not—the IRS has not advanced this theory before where any change in the value of a derivative contract needs to be deemed a realization event. Instead, where there's continuing uncertainty, one waits until you know the nature and amount of whatever gain or loss you have. And we think that uncertainty still needs to be respected here. You had a colloquy with Judge Newman a moment ago about whether or not there was authority for one proposition or another. And can you give us your assessment of the state of the law on this? That is, I guess we're talking about courts of appeals. The state of the law on this generally, Your Honor? Yeah. It's sparse. I think it is a fair way to characterize it that the law I grant is sparse in this area. That said, I think the law, to the extent it exists, all is directionally in one direction. And that's in favor of the taxpayer here. In that it points not to economic values and changes of value— It's in favor of the taxpayer in that there's no jurisprudence or case law against the taxpayer, right? We think it's favorable, and obviously we cite in our brief a number of precedents that we think actually support our position quite strongly, in that courts have repeatedly said—the short sale example is, we think, perhaps the best one— in that the Supreme Court, too, has said a short sale remains open. Actually, I said it's the Supreme Court. I don't believe that that was right. I think that's from the tax court. But short sales are considered open transactions. And a short sale can be viewed in a way as every day you're changing the expected value of settling that transaction. IRS has never said, no court has ever said, that every day you have to revalue that and determine whether you— A short sale, you're changing it, or you mean the market is changing it? The market is. The market is changing it. You're not negotiating for a new strike price. No, every day that one keeps a short sale— When you say it's changing, that's a different kind of change from the change here. But every day that you and your counterparty decide not to settle that short sale or your counterparty decides not to demand delivery on the short sale, the expected cost of satisfying your obligation is changing. Every single day. Every day it's kept open, there's further uncertainty as to whether you can have gain, loss, etc. That's the original bargain. This is—the original bargain is for an undetermined period. But we'd also point to 2004-15, the revenue ruling, where the IRS says even where you change your bargain, you change your bargain and say, I'm going to replace my short sale with broker-dealer A and put on a short sale with broker-dealer B. Obviously a change in bargain. The IRS says— There is law if you change the insured in a life insurance. That matters, doesn't it? Yes, there is. There are some analogies both ways and we have to decide which analogies matter. Is that what it comes down to? Ultimately, yes. As in so many cases, this Court is faced with trying to draw analogies. But I think the life insurance example is actually quite helpful to us in that that would be analogous here if Mr. McKelvey had changed the stock that was referred to in the VPSC. Because then his transaction would be done. There would be no possibility that he would ultimately have to deliver 6.5 million shares of Monster stock. Here, he kept open that same very real possibility that these transactions would end up in a sale of 6.5 or 5.4 million shares of Monster stock. Until that was determined, until there was certainty one way or the other as to how many shares of stock he owed,  there is no realization. There is a continued uncertainty. Because that is not, in our view, a fundamental change or, more relevant here, a relief from his liabilities. Thank you. Thank you. We gave you some extra time, of course, as we did for Mr. Carpenter. Mr. Carpenter, you've got two minutes. Thank you, Your Honor. This isn't a new approach that the IRS is taking. This is a longstanding approach that's being applied to a new circumstance. There isn't case law about VPFCs, as was discussed. But that Revenue Ruling 90-109 has been in place since 1990, and it's long been understood to set forth the fundamental or material change rule that a taxpayer who changes the terms of their financial instrument in a fundamental, material way, is treated for tax purposes as having ended the old contract and entered into a new contract. If that contract is property, then it's an exchange of property. It's taxed as an exchange of property under Section 1001. And then this case presents a new scenario where, if it's not property, and we believe that it was, but if it's not, you still have terminated the obligations. That's never come up before, but it's a necessary implication of the fundamental change and the resulting termination and entry into a new contract. You've terminated the old obligations, and so that's a taxable event. Realization of gain is all about timing. It's just a timing question. When should you determine whether there's been a gain or a loss? And it's appropriate to do that when there's been a new contract, whether in fact or as having been deemed. On the property issue in the case, tax court said it was not property. Tax court said it was not property. At the time of the exchange. At the time of the exchange. Do you think the question of whether it's property should be answered at the time of the exchange or at the time that the property is acquired? We think it should be at the time the property was acquired, at least in the case. Is there any law on that? There is not that specifically says that. We would point to the Stavisky case, which is a somewhat similar situation, but not the exact same situation. So if it should be determined at the time it's acquired, it is property. Yes, yes. The only way the tax court said it wasn't property is to view it later when there was only an obligation left. That's correct. That's correct. And when you're talking. If the date is the time of acquisition of the item, I don't want to even call it an asset, that loads the item in question, then the tax court would have been wrong in its first step, namely that it's not property. That's correct. That's the commissioner's position. That's our position, that at least in the case where you're talking about a bilateral financial instrument where both people have. One other question. On the other side of the case, the constructive sales side, is there any area, any case, any situation in tax law where a property would be valued for tax purposes depending on whether a price was so low that it couldn't realistically go above a strike price? Any other situation outside of a constructive sale? Yeah. Any other situation where you would say, well, this is so low, and so there's this 15% probability that it'll ever reach this, and that's a reason why we're saying there's a constructive sale. Does that ever happen anywhere else in the tax law? I'm not a, not that I know of or can think of off the top of my head. I do think it's implicit in the statute, because Congress said you have a constructive sale where the property to be delivered is substantially fixed, and so I think a probability. I see. You think substantially fixed can include probability analysis. That's right. That's right. Really, it's sort of a basic substance over form question. My friend on the other side wants you to focus on what was the form of the contract, and in form, yes, there was a theoretical possibility that there could be a amount of property other than 6.5 million shares that would be delivered. Suppose if the company, not realistic with Monster, but if the company had various assets and oil was found in one of them the next day, I don't suppose the IRS would give them a refund and say, oh, we were wrong. It really was very valuable. Well, no, the IRS wouldn't give a refund, but the statute does provide for making adjustments, recognizing the constructive sale is not a sale that actually happens. The actual sale happens later. The code does provide for adjustments to be made later at the time of the actual sale, and more generally, because we're talking about realization and it's a timing issue, the gain that was realized at the time of these contract modifications would be essentially credited to the state later on when the transaction settles. If there's a death. Right. That's probably moot in the case of the death. It's not only moot, but there wouldn't be an adjustment because the state gets these stepped-up basis. Correct, yes. That's correct. So in this instance, it wouldn't. A subsequent rise in the value wouldn't avail the taxpayer or his estate anything, right? Yes, I believe that's right, yes. Thank you, Mr. Calder, very much. We reserve decision and we're adjourned. Thank you. We're adjourned.